Good morning. Good morning. May it please the court, I'm Karen Landau and I represent Nellie Kesoyan. I'd like to save a couple of minutes for rebuttal if I manage to do that. So this case presents two questions. First, whether a low-level front office employee of the Social Security Administration altered a record that was either unusually probative or essential, and second, whether she occupied a position of trust vis-a-vis the Social Security Administration and or the U.S. Immigration Service. So this is a case where, you know, Mrs. Kesoyan worked for the Social Security Administration and she had the bad judgment to issue two benefit verification letters that contained a false address for a friend of her husband. And they were submitted in an immigration proceeding, and she knew that. She was convicted, and the question is, you know, what is the standard? How do we interpret this guideline? The guideline was passed as part of the Sarbanes-Oxley Act, and its intention was to provide additional punishment for persons who either altered substantial numbers of records or records that were essentially — were either essential or unusually important to an underlying — to an investigation. And that's just simply — the record doesn't show that here. Counsel, my understanding is that the district court referred to the facts in the United States v. Matthews, which, of course, is not from our circuit, in determining whether there was an obstruction of justice enhancement. In what way did the court go wrong by referring to Matthews? Well, the Matthews case actually shows why the court is wrong. And the Matthews case is the only case published on this particular guideline subsection. In Matthews, the defendant was a VA nurse who was treating a patient in intensive care. The patient had been scheduled for transfer — to be stepped down to a lower level of care. And he didn't — who knows what he was doing, but he — first, he didn't record any vitals, and then he just recorded some false vitals. As a result, the patient was transferred, and then he died. When confronted, the defendant went in and added additional records. So the — the court properly found that these were essential records. They were essential for two reasons. They were life and death. They were related to a person's medical care. And they were — and second, when he altered the records a second time, he knew there was an investigation. And he — he knew that the — what he had done, that the notes were going to be determinative of the investigation. Other than the life and death aspect, what's the difference between all these? The difference is that the Social Security letter, the benefits verification letter, really doesn't have — it didn't even have any weight to the hearing officer. The hearing officer didn't even really consider it. She was like, well, this isn't enough. She asked for more. First of all, there were two denials in this case. The first denial, she denied because she found he wasn't of good moral character. When he came back again with a second letter, which was inconsistent with the first letter, you know, the — she was like, well, why don't you have more to show you've lived here for this long? She asked for — what did she ask for? Utility statements, things like that. But that's when — that's when your client stepped in, though, and provided yet another false document. The affidavit, which she also — which also wasn't unusually — again, we have — it can't just be probative. It can't just be a piece of evidence. It has to be essential or unusually probative. These records were not that — Did she think it was going to be helpful? I'm sure she thought it was going to be helpful. Obviously, she did. But that's not the test. I don't think that — the guideline is not about what the defendant intended. It's about the nature of the records. So if it's the nature of the records, are you saying simply because the — the officer who was evaluating the evidence didn't put much weight or any weight into the Social Security benefit verification letters, therefore, they're — they're not essential? I would say that's part of the equation. The other part of the equation is to look at the nature of the records in and of themselves. And if you — if you note — So — so what are we — what are we looking for? Well, I think — I think we're looking for — I mean, I think we can look at a lot of different examples. I think we can talk about — I think this — if you look at what was intended, this guideline was intended for significant financial records. So what — but let's — but just let's look at the Social Security Administration itself here. The Matthews case didn't involve financial records. No, it didn't. And the guideline is not limited to that. But we're talking about medical records that are essential to — they're essential both to the investigation, to guilt or innocence. What she provided was something that was just a piece of the puzzle. It was — it was a piece of evidence that went to whether he actually lived in the district. Well, maybe — maybe I didn't understand the facts, Ms. Landa, or the effect of them. So straighten me out. I thought that the original thing that was done was to falsify the address so that he lived in Sacramento rather than in Los Angeles, and that this shortened the time that he — materially that he would have to wait for these proceedings. That's what he thought, certainly. That — that — it seems to me that that makes a huge difference, because that is — is cheating the system, materially. Well, he definitely cheated the system, and they definitely did. There's no — And she — she made it possible. She participated in that. But I think the question is, did — this piece of evidence just was not particularly probative. And — But what does that — what does that have to do with whether she committed a crime, or rather not crime, but how she was punished? Because in the — in the Matthews element, we're talking about obstruction of justice. I mean, there's a lot of discussion about obstruction of justice — Right. — of late, and of course — and in this case, we're talking about she — the — the hearing examiner wanted to know, what evidence do you have that he lived in Sacramento? This woman falsified that information, provided it for this person. That certainly didn't help justice. It certainly — No — — gave the impression that — No, but she's — Your Honor, you're right, but that's the basis of the conviction. I think what I'm saying is that the guideline requires something more for the extra two levels. She already got three levels for substantial interference with justice. She got the base offense level for obstruction. The question is, what is the nature of this record? And I mean, I would just like to point out one other thing. Social Security doesn't even rely on the stated address. They — you know, for example, you don't get your benefits at your address anymore. You get your benefits electronically. It's just not a particularly probative record. It's — So I'm still trying to understand how we evaluate what's probative. I think you evaluated — Let me just — Oh, sorry, Your Honor. The defendant intended it to be probative. The officer didn't consider it probative. That's right. So where do we fall? How do we determine what's probative? I think you consider what the officer thought. I think you also consider what the nature of the record is in the context of the Social Security — what does it serve in the Social Security Administration? They try to have an accurate database, but do they rely on it? Do they — how does it function within the Social Security Administration? What's the evidence that the Social Security Administration does not rely on these addresses? There's not any evidence that it does. Your Honor, if I may, I would like to just address — I'm running out of time, and I'd like to address the abuse of trust issue briefly. I don't want to — yeah. So again, this — she did not hold a professional — a decision-making — you know, a position of — that involved professional discretion. And again, I'd just like to refer the Court to the Harmath decision, which is cited in my brief, and also the Evans decision. I think that this is — this is a case where the Court conflated the concept of she was trusted, she — you know, her employer expected her to perform honestly, withholding a position of trust. And the type of work that she did did not involve professional discretion. Sotomayor, what about the coaching in the interpreter? Yeah, that's — so she doesn't have a relationship of trust with the — with the Immigration Service. I still want to say INS. That's how old I am. But she doesn't — you know, that is not — she doesn't have a position of trust in relation to the government. She did have a special skill, and I conceded that, but she got — if you recall, she got both the adjustments for supervisory role and for — Why was she interpreting in the first place, then? Who — Because she was a friend of the husband's, and — I mean, he was the husband's friend, and she was a translator. Yeah. Was it — who was she — was she being paid? I don't believe so. She didn't get any money for any of this. No. She just came in, but she came in and she translated. Like, a lot of times in immigration proceedings, my understanding is, the applicant brings their own translator. And she brought — he brought her, and she translated. Okay. Let me ask you one more thing. I know that your time — maybe we'll give her an extra minute, because I was curious during the — this is a bit hot, tough sentence for what happened here. And so I was just curious, the judge during the course of sentencing said that he was going to make an example of her. Is that appropriate? Well, you know, I guess not really. Not really. But, you know, Your Honor, he did say that, you know, he felt he needed — he wanted to send a message to the community. Yeah, it was a very harsh sentence. And if I — I mean — Isn't that one of the elements of 3553A? It is. And I did not make — I mean, I raised procedural error arguments because they were — because I did. That's what I did. Okay. Okay. I've got one more question on position of trust. Sure. Are we looking only at a position of trust as a translator or as — in our Social Security Administration as a claims rep? I think you can look at both. The government argued only for position of trust as in the Social Security Administration. But the Court, of course, can affirm on appeal, so I addressed the alternative argument. But I think under — I mean, as a translator, she's clearly not. The — this Court has held that a lawyer who presents false asylum claims doesn't hold a position of trust. So if a lawyer doesn't, I don't see how a translator does. But a lawyer is not employed by the government. She wasn't employed by the — she was not employed by the INS. She was employed by the Social Security Administration. I understand that. But she was working for the government. Yeah. Yeah. Well, she was working for the government, but she didn't present herself that way. Did she take — was she put under oath as an interpreter? Yes. Just like a lawyer submits an asylum application. Okay. Thank you, Your Honor. Very well. Let's hear from the government. Good morning. May it please the Court. Miriam Hinman for the United States. I'd like to clarify three things that came up during the appellant's argument and in the reply brief to make sure that the Court does not have any misperceptions. The first is on the argument about whether the records were specially probative. The defendant has been arguing in the brief and in the argument today about the Social Security letters that Ms. Kassoyan produced. The government's argument is that the Social Security electronic database records were especially probative, not the letters that Kassoyan produced. Well, hang on a second. Officer Henderson didn't rely on the Social Security Administration records either, did he? He insisted on more for determining what her address — his address was. Yes, the officer did not find the letters adequate, was concerned, and asked for more. As part of the investigation that ensued, investigators ended up looking at these database records. It's those database records that Kassoyan altered in the internal database, expecting that investigators might check them to verify her letters. And that was the government's argument and the Court's finding below. It was about those database records, which you can see at ER 6 and 8. Another point that the defendant made in her argument just now is that there's no evidence that SSA relies on its records of address. That is not correct. There was trial testimony that SSA relies on its records of address in a number of cases, and also being able to determine the correct amount of benefits. And you can see that at SER 36 to 37. The third point that I'd like to clarify is regarding the abuse of trust adjustment. At the time of the offense, Ms. Kassoyan worked for SSA as a claims representative, not a service representative. And I'm... Let me ask you this. Did her position as a claims representative have anything to do with the work she was doing as an interpreter? Her position as a claims representative did not formally have anything to do with her role as an interpreter. The way in which... And did she use her position as a claims representative to represent that she had some sort of special knowledge or information that she was passing on? Or did she just produce these records without any indication that they came from her as a claims representative at SSA? In other words, did she try to use her position as leverage or moral weight for credibility  When she was acting as an interpreter in the interviews, she did not use her position at Social Security to try to gain more credibility. She did use her position at Social Security to produce the letters that she provided to Movsesian who could then put those into his application. And she used her role with Movsesian was a combination of interpreter and advising him using her role at Social Security to provide additional information. So the translator function is not anything you think we ought to focus on. It's her role at SSA in providing the addresses, corrupting the database and so on that's the issue here. Not the fact that she was a translator. Well the government has made both arguments and the court below found both her role at abuse of trust adjustment. So those are both being reviewed here under plain error. The government is arguing both. The government's primary argument is that she abused her position at Social Security because she was required to evaluate evidence before updating records. Instead, she falsified records knowing that they were false. The government is making an alternative argument that you don't need to reach that her position as an interpreter and advisor to Movsesian was also a position of trust. Since we can uphold on any ground found by the court, you're saying if we weren't persuaded by the translator aspect in terms of the position of trust, but were by the SSA portion, that would be sufficient? Certainly. In her position of trust, she was a claims representative? Where does the professional or managerial discretion come in in that? As a claims representative, she had several discretionary responsibilities. One of those was determining payment rates, which required judgment. Another was evaluating the validity and acceptability of evidence prior to updating records. So part of her job was updating records, but she was supposed to evaluate whether evidence was adequate before doing that. In this case, she updated the records without proper proof, and so she was abusing that discretion that she had in her position. She wasn't – she didn't get any money for this. She had, as I read the record, and I may be wrong, but she had an otherwise exemplary record, wasn't that right? There's no indication that she made money for this. She did generally have an exemplary record, although there was some information in the record that she had one other instance at Social Security of assisting someone who was an acquaintance. Yeah. And she was Armenian? That's correct. And the person that she was helping was Armenian, was a friend of hers? Yes. And that's part of the reason she was able to assist as an interpreter. Right. That was her motive, was to help her friend. And this is a very stiff sentence, it seems to me, for what she did, because this is not the normal abuse of trust. The normal abuse of trust is the person in the bank who has all of the responsibility for money and takes it. I mean, that's the classic situation. This isn't that. It is a substantial sentence. There were also reasons for that. She was a government employee who abused a position of trust. She also went to trial and lied on the stand. The district court concluded that she had demonstrated contempt for the law, the legal process, and those who enforce it. And the district court ---- Is that why he said that he was going to make an example of her? He made it clear that he was concerned about deterrence in this case. And I think when ---- Deterring whom? You're supposed to sentence the individual before you based on the factors in the statute and the guidelines. That's true. And I think he absolutely ---- And not to influence, not to send a message publicly, necessarily. Isn't that right? The judge described factors that were specific to her that he was taking into account, but he also was talking about general deterrence, which is something that he's permitted to take into account. And he said that the sentence was necessary to deter obstruction of proceedings, abuse of positions of trust. And those are things that the judge can take into account. But again, for her specifically, she had abused her position at Social Security, and she had also demonstrated this contempt for the law by lying on the stand at trial and just throughout this process. Her abuse of her position at Social Security did not involve a claim. It involved her manipulating the records in Social Security. That's correct. It did not involve a claim, but part of her job was accessing and maintaining these Social Security records. And so she altered those Social Security records. That was something. She took advantage of her access. That's correct. To those records. And abused the ---- Within the meaning of the guidelines, I'm not sure. It's a little different question. Well, the trust that was left, that they handed her in her position, was the trust to adjust these claims. It's the trust regarding the claims, but it's also the trust about evaluating evidence to make sure it's adequate before she changes information in the Social Security database. She was supposed to evaluate. She was supposed to examine evidence to evaluate its validity and acceptability, which you can find in her position description at ER 157-62. So before she updated records, she was supposed to evaluate whether the evidence was acceptable. That was discretion. And she abused that. Well, her discretionary call wasn't to decide where an address was. It was to decide whether or not a claim was to be approved. That's the discretion she had in her position, true? The government is arguing she had at least two kinds of discretion. One of those was about what kind of payments someone was eligible for under a claim. Absolutely. But the second was she was required to evaluate evidence to determine its validity and acceptability before updating records in the database. Okay. But part of the discretion wasn't to decide where someone lived. Certainly not. Okay. All right. Can I ask you one other thing? I'll give your opponent some additional time as well. This is something of a hypothetical, but let's just say hypothetically that within the community that she belonged, there was a great deal of recent convictions for fraud involving government entities and government programs. Would it be proper for a district judge to take that into account in quotes in sending a message, in quotes, even though she had not been involved in any of these other types of crimes? For example, electronic wheelchairs. Lots of that. Lots and lots and lots. Millions of dollars worth. Well-known criminal offenses in that community. Of course, it's all individual, not the community. But would it be lawful for the district judge to take that into account in his 3553A evaluation? If Your Honor is asking whether it would be lawful for him to target a particular community that appears to be very involved in crime, I believe- Of a government fraud nature. But if it's a particular community involved that is being targeted for that fraud, I don't believe that targeting a particular community with sentences would be appropriate. But generally, finding that a particular type of crime is prevalent, especially if it is often not detected and therefore requires deterrence, that would be a reasonable consideration for a judge. Other questions by my colleague? Thank you very much. So we're going to give the petitioner a couple of minutes to rebut. Thank you. Thank you very much. Thank you, Your Honor. I would like to start with your hypothetical. My answer to that question would be no. Because if you do that, first of all, you know, if she were part of a ring and there was a conspiracy and, you know, you had a situation like that, you know, you could talk about the whole you could still be sentencing the individual. But to treat a defendant harshly because there's a lot of fraud-related crime in a particular community is essentially punishing the defendant for the actions of the group, not what she's done. Right. So the deterrent aspect can't relate to the larger group. No, it can't. And in fact, it wouldn't here because, you know, she was an employee. I mean, it just I don't see how that would even work practically. I'm not saying it doesn't. No, no. That just occurred to me. I wanted to just mention a couple of things. So from my reading of the record and the testimony of the Social Security Administration employees who testified, a claims representative and a service representative had the same duties. In terms of abuse of trust, I really went back to the guideline application notes in this case, and her position is much more similar to that of a bank teller who doesn't have a position of trust. It's not just that your employee, again, the fact that she was trusted to do certain things is not a position of trust. A bank teller is trusted with money. They are trusted to update information, much like Mrs. Kassoyan, in a database if an employee, if a customer comes in and says, I need to change my address, you change their address in the file. But how is that different from the Social Security Administration employee? They have the same access, but the guidelines tell us bank tellers are not, do not hold a position of trust. But the bank auditors do. The bank auditors do, or a bank executive does, a lawyer does. Well, kind of, you know, I mean, that's the situation. She just doesn't meet those categories. I mean, again, I'm going to refer back to Contreras, which is the prison cook case. She was trusted, and I believe she smuggled drugs. I don't remember what she did, but she smuggled drugs or did something like that. No position of trust. And I see I'm out of time. I'm sorry we don't have more time, but we thank you both for your argument, and the case just argued is submitted.
judges: Schroeder, M. Smith, Rayes